GERALD SMITH et al., Plaintiffs-Appellees, v. THE CITY OF WOODSTOCK, Defendant-Appellant.

(No. 72-154;

Second District—March 8, 1974.

*Rehearing denied April 10, 1974.*

Caldwell, Berner & Caldwell, of Woodstock, for appellant.

Joslyn & Green and Michael J. Sullivan, both of Woodstock, and Clemens Hufmann, of Chicago, for appellees.

Mr. JUSTICE THOMAS J. MORAN delivered the opinion of the court:

From an order enjoining further operations of a sewage treatment plant and the construction of a proposed storm drain, the defendant appeals contending that the trial court abused its discretion.

The sewage treatment plant, located upstream from plaintiffs properties, began operating on August 4, 1971. Its treated effluents discharge directly into the Kishwaukee River, a natural watercourse which runs through the premises in question. On September 29, 1971, plaintiffs filed their complaint for injunction.

Evidence adduced at trial disclosed that at the time of trial the plant was operating at one-third capacity; that, designed to serve 6000 people, it would, at maximum capacity, discharge 1.16 cfs (cubic feet per second) or 750,000 gallons of effluent daily; that its design was in accordance with Sanitary Water Board standards and did not permit any by-pass of raw sewage, and its discharge water was of better quality than the surface water which naturally drains into the Kishwaukee.

It was established that the river has a carrying capacity of 700 to 800 cfs at the point of discharge; that it has been subject to flooding; that there is evidence of soil erosion and that the plant's discharge of additional water could increase the flood risk and erosion problem. One plaintiff testified that during each of the last 5 or 6 years prior to the plant's operation, he had lost 6 to 12 acres of corn due to poor growing conditions occasioned by a high water table. Other testimony revealed that, prior to the operation of the plant, the river was dry during certain months but that at the time of trial, normally the river's dry season, its bed contained 14 inches of muck and 18 to 20 inches of fluid.

Pertinent to the storm drain, evidence established that defendant proposed to construct a 48-inch tile which was to empty into the Kishwaukee watershed above plaintiffs' properties; the storm drain was designed to collect water from the "Schryver Avenue" area, a depression in the landscape that has no natural outlet toward the Kishwaukee; water from the "Schryver Avenue" area naturally drains toward Silver Creek; the storm drain was also planned to serve the Flood farm (an area currently vacant but being converted to a residential subdivision with curbs and

gutters); the Flood farm area naturally drains into the river; the headwall of the storm drain was planned to empty at the Route 14 by-pass, between 600 and 1300 feet north of the river; the maximum discharge of a 48-inch pipe is 100 cfs, or 64 million gallons per day, and the amount reaching the river was estimated at between 25 and 100 cfs daily.

While the trial court found that the effluent from the disposal plant was clear, pure and odorless and that no evidence was introduced to show present flooding or diminution of value of plaintiffs' properties, it also found existence of a threat of future flooding and/or contamination of the river due to the operation of the plant and the proposed storm drain use, and held that such future threat interfered with the natural watercourse and thereby constituted "an invasion of plaintiffs' property rights as riparian owners." An order was entered enjoining the defendant from further discharging effluents from its plant and from using its proposed storm drain. The order awarded nominal damages in the sum of $1 to the plaintiffs. Enforcement of the injunction was stayed pending appeal.

■■ Concerning the issue of the injunction against the proposed storm drain, the courts of Illinois are committed to the natural-flow theory. (*Elser v. Village of Gross Point*, 223 Ill. 230 (1906); *Mello v. Lepisto*, 77 Ill.App.2d 399 (1966); *Templeton v. Huss*, 9 Ill.App.3d 828 (1973).) Artificial channels may be built along natural channels notwithstanding the fact that the flow over the servient tract of land may thereby be increased (*Peck v. Herrington*, 109 Ill. 611 (1884)), but no one has the right to collect water and by means of an artificial channel cast it upon the land of another in undue quantities or contrary to its natural course; any attempt to do so is enjoinable in equity. *Elser v. Village of Gross Point*, 223 Ill. at 241.

■■ That natural run-off of the "Schryver Avenue" area was toward Silver Creek. The fact that this area does not naturally drain into the flood-prone Kishwaukee basin supports the conclusion of the trial court that the proposed storm drain created a threat of future flooding with resultant irreparable injury and, therefore, was subject to being enjoined. (*Elser v. Village of Gross Point*, 223 Ill. 230 (1906).) Concerning that portion of the storm drain serving the Flood farm which naturally drains into the river, the defendant cannot be enjoined from constructing artificial channels along natural channels, even though the flow may be increased. Ill. Rev. Stat. 1971, ch. 42, § 2—1; *Templeton v. Huss*, 9 Ill.App.3d 828, 840—841 (1973).

We approach separately the three-fold considerations underlying the court's order enjoining further operation of the disposal plant: the potential contamination of the river by the discharged effluent, the present

collection and emission of unnatural-source water into the river, and the effect of the future additional water upon the riparian rights of the plaintiffs.

■■ As to any potential contamination, there was no evidence to indicate that the quality of future effluent would vary from the present, it being clear, pure, odorless and of better quality than the water which naturally drains into the river. Since it was additionally established that the plant was constructed to prohibit the by-pass of raw sewage, the finding that there existed a threat of future contamination was without support and, in this regard, the trial court's order was in error.

While the law of natural flow of surface water was found pertinent to the storm drain, the following considerations are affected by the body of law applicable to the rights of riparian owners.

There is no dispute that the present efflux of water originates from an unnatural source and increases the river's burden. The trial court held that this, by itself, was sufficient to enjoin the present operation of the plant, stating that, even though "no evidence of present flooding or diminution of the land values of the properties of Plaintiffs has been shown, [the discharge of effluent] *is nevertheless an interference with a natural watercourse and an invasion of the property rights of the riparian owners or residents, the Plaintiffs herein.*"

■■ In *Clark v. Lindsay Light & Chemical Co.*, 405 Ill. 139, 142 (1950), the Illinois Supreme Court held that the riparian owner of land has but a usufruct right to the water while it passes, this natural right being similar to a landowner's right to light and air above the land. In *Haack v. Lindsay Light & Chemical Co.*, 393 Ill. 367, 375 (1946), where the issue concerned the use of the air, the court stated:

> "To entitle one to injunctive relief he must establish, as against the defendant, an actual and substantial injury and not merely a technical inconsequential wrong entitling him to nominal damages, only. To warrant the allowance of the writ of injunction it must clearly appear that some act has been done or is threatened against the plaintiff which will produce an irreparable injury to him."

See also *Clark v. Lindsay Light & Chemical Co.*, 341 Ill.App. 316 (1950); *Fink v. Board of Trustees of Southern Illinois University*, 71 Ill.App.2d 276, *appeal denied*, 34 Ill.2d 631 (1966). However, see *Barrington Hills Country Club v. Village of Barrington*, 357 Ill. 11, 19-20 (1934).

■■ Having found no present injury, actual or substantial, only a technical, inconsequential wrong amounting to nominal damages of $1, it was error for the court, at this point in time, to restrain defendant's operation.

There remains the consideration of the future threat of flooding. Evidence established that at the site of the plant the river is capable of accepting the plant's maximum discharge of water, but the record is silent as to the river's capability downstream, except that the area is prone to flooding and that, at the time of hearing (a non-flood season when the river is usually dry), while the plant was operating at one-third capacity, a 32-inch water level was found (sludge plus water). The trial court held that, although plaintiffs' lands have not as yet sustained flooding as a result of the plant's operation, the future threat exists and plaintiffs were therefore entitled to injunctive relief.

■■ As earlier stated, to warrant issuance of an injunction for an existing wrong, actual or substantial injury must be shown. Pertinent to future injury, however, our supreme court has stated:

"When an owner of property is about to be deprived of a legal right in connection with it by the wrongful act of another for which there is no legal redress the act may be restrained by injunction or, if it has already been executed, may be required to be undone, if this is practicable. The irreparable injury necessary to give a court of equity jurisdiction in such a case is not one so great as to be impossible of compensation, but one of such a character that the law cannot give adequate compensation for it. The fact that no actual damages can be proved, so that in an action at law the jury could award nominal damages, only, often furnishes the very best reason why a court of equity should interfere in a case where a nuisance is a continuous one.' (Elliott on Roads and Streets, 497; *Newell v. Sass,* 142 Ill. 104.) Where an injury is of such constant and frequent occurrence that no fair or reasonable redress can be had for it in a court of law it may be enjoined. *Chicago General Railway Co. v. Chicago, Burlington and Quincy Railroad Co.* 181 Ill. 605." *Winhold v. Finch,* 286 Ill. 614, 619 (1919).

In situations similar to those here, decisions seem to take divergent views as to what factors a court may consider before issuing an injunction. In *Hill v. Kimball,* 269 Ill. 398, 416 (1915), the court, quoting from *Lloyd v. Catlin Coal Co.,* 210 Ill. 460 (1904), stated:

"In cases where mandatory injunctions are asked for, 'it is the duty of the court to consider the inconvenience and damage that will result to the defendant as well as the benefit to accrue to the complainant by the granting of the writ, and where the defendant's damages and injuries will be greater by granting the writ than will be the complainant's benefit by granting the writ, or greater than will be complainant's damages by the refusal of it,

the court will, in the exercise of a sound discretion, refuse the writ.' "

See also *Bondy v. Samuels*, 333 Ill. 535, 550 (1929).

In *Barrington Hills Country Club v. Village of Barrington*, 357 Ill. 11 (1934), where effluent from the defendants' plant was contaminated creating an immediate infringement on plaintiffs' rights, the court was asked to balance the rights of the municipality with those of the riparian owners. The response, at page 20, indicated:

"Conveniences have never been balanced in this State and equities have never been weighed where a private right or private property was sought to be taken by other than due process of law and the party injured sought to enjoin such taking. It is not necessary to repeat the cases cited above, but they, and many others in this and other jurisdictions whose decisions we respect, express this same view. We are aware of the decisions [Citations omitted]. We have never followed the rules announced in those decisions, and in spite of the argument made that there is a necessity caused by changing conditions, we are not disposed to brush aside the decisions contained in an unbroken line of authorities found in well considered cases over a long period of years."

The subsequent case of *Haack v. Lindsay Light & Chemical Co.*, 393 Ill. 367, at 375 (1946), seemingly follows the rationale of *Hill v. Kimball*, 269 Ill. 398 (1915), by considering the reasonableness of the operation:

"It is apparent from this record that appellant was not only engaged in a lawful business but was, at the time of this hearing, engaged in essential war work which would have been seriously impaired had it been required by injunction to cease operations. Such may be considered in determining whether the operation of its plant in unreasonable. *Heppenstall Co. v. Berkshire Chemical Co.* 130 Conn. 485, 35 Atl.2d 845."

In *Clark v. Lindsay Light & Chemical Co.*, 405 Ill. 139 (1950), this court posed the question of whether, according to the master's findings, *Haack* modified *Barrington* by adopting the doctrine of "balancing of conveniences" and "weighing of equities." The court sustained the master's finding and, in so doing, relied on *Haack*, but the question posed was not directly answered. The recent case of *Fink v. Board of Trustees of Southern Illinois University*, 71 Ill.App.2d 276, 280 (1966), interpreted *Haack* as not only allowing the doctrine but as overruling *Barrington* in part. There, converse to our situation, plaintiffs suffered a loss of water because of defendant's construction of a dam. In applying the doctrine, the court stated, at page 278:

"The loss, if any, to the plaintiffs by any decrease in the flow

is minimal. On the other hand, the benefits to defendant from construction of the dam are substantial. Under these circumstances the refusal to enjoin construction of the dam was proper. Haack v. Lindsay Light & Chemical Co., 393 Ill. 367, 66 NE2d 391; Clark v. Lindsay Light & Chemical Co., 341 Ill.App. 316, 93 NE2d 441."

We do not find that *Haack* in any way overruled *Barrington*, but rather interpret it as modifying *Barrington* by allowing the trial court to apply the doctrine of "balancing of conveniences" and "weighing of equities" when considering the issuance of an injunction under the circumstances here.

In the instant case, as evidenced by the record, the trial court relied solely upon *Barrington.*

■■ While defendant has an obligation to protect the health, welfare and safety of the public it serves, it may not, in the performance of such duty, jeopardize or infringe upon plaintiffs rights. Because of the duties imposed upon the defendant, we believe it deserves to have the doctrine considered. It may be that the court, in considering the doctrine, will find that alternative measures can be established (*e.g.,* dredging, creation of holding ponds, etc.) which will assure continuing protection of plaintiffs riparian rights while allowing defendant to perform its essential duty.

For the reasons stated, we affirm the portion of the order enjoining the discharge of water from the "Schryver Avenue" area only, reverse and remand for consideration as stated herein that portion of the order based upon the threat of future flooding caused by the operation of defendant's disposal plant and reverse the balance of the order.

Order affirmed in part, reversed in part, and reversed and remanded in part.

GUILD, P. J., and SEIDENFELD, J., concur.